## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NUMBER 16-34028 |
| | § | |
| NORTHSTAR OFFSHORE | § | |
| GROUP, L.L.C., | § | |
| DEBTOR. | § | CHAPTER 11 |
| | § | |
| JAMES KATCHADURIAN, | § | |
| LITIGATION TRUSTEE | § | |
| PLAINTIFF, | § | ADVERSARY NO.18-3366 |
| | § | |
| V. | § | |
| | § | |
| BP ENERGY COMPANY, | § | |
| DEFENDANT. | § | |

## SECOND AMENDED COMPLAINT TO AVOID AND RECOVER PREFERENTIAL AND FRAUDULENT TRANSFERS

James Katchadurian, as Litigation Trustee (the "Trustee"), files this his Second Amended Complaint to Avoid and Recover Fraudulent Transfers pursuant to 11 U.S.C. §§ 547(b), 548 and 550 against BP Energy Company (the "Defendant" or "BP"), and alleges as follows:

## I.
## Introduction

1.    This adversary proceeding against the Defendant is brought under Fed. R. Bankr. P. 7001.  By this adversary proceeding, the Trustee seeks to avoid and recover, pursuant to §§ 547(b), 548(a)(1)(A) and (a)(1)(B), and 550 of the Bankruptcy Code, preferential transfers that the Debtor, Northstar Offshore Group, LLC, ("Debtor" or "Northstar") made to the Defendant.

## II.
## Jurisdiction and Venue

2.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334.   This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F), (H) and (O).   Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a).

## III.
## Parties

3.     The Plaintiff is the Trustee.   The Trustee was appointed pursuant to the Litigation Trust Agreement which forms a part of the Second Amended Plan of Liquidation (the "Plan") of Northstar Offshore Group, LLC (the "Debtor").   The Litigation Trust Agreement was approved by the Court as part of the Plan.

4.     The Defendant is BP Energy Company, a Delaware company.   It may be served with summons pursuant to Fed. R. Bankr. P. 7004(b) by serving the summons along with a copy of the Complaint on its registered agent: The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801.

## IV.
## Nature of Case

5.     Northstar knowingly and intentionally entered into the objectively bad transactions with BP for immediate cash with the intent to hinder, delay and defraud its other creditors due to its subsequent obligations to repay BP.   In addition, Northstar knowingly and intentionally made the Transfers to BP with the intent to hinder, delay and defraud its other creditors due to its obligations to BP.

6.     Northstar was owned and controlled by one of a group of hedge funds commonly known as Platinum Partners ("Platinum").   One of Platinum's primary investment strategies was

to provide high-interest loans to vulnerable companies in exchange for a percentage of the ownership in the vulnerable company.  After the company paid on the high interest loans for some time, Platinum would sell off the company's assets to a new company of which Platinum had acquired leaving the creditors of the wrecked company with little to no recovery.  This strategy appeared to have worked initially but after several years, the losses in the vulnerable companies caught-up with the hedge fund turning the hedge fund from a going concern to a Ponzi scheme. At the time Platinum caused Northstar to enter into the transactions and subsequent Transfers with BP, Platinum did so to provide it with immediate cash in order to further prop-up the illusion of a profitable hedge fund when in fact it was nothing more than a Ponzi scheme.

### V.
### Background

7.     Platinum Partners Value Arbitrage Fund, LP ("PPVA") is a now-defunct hedge fund founded in 2003 by Mark Nordlicht, as its public face, and Murray Huberfeld, as its behind the scenes man.  In September 2011, an affiliated company Platinum Management, LLC registered with the Securities and Exchange Commission ("SEC") as an investment adviser.  The Platinum group of business organizations also included Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO") and later Platinum Partners Value Arbitrage Oil & Gas ("PPVA O&G") also known as Platinum Partners Northstar Energy ("PPNE").  The majority of the assets of the Platinum group were in PPVA and PPCO.  The Platinum group of companies were controlled by a group of individuals and are referred to as ("Platinum") in this Complaint.   The following sets out the individuals who controlled Platinum and subsequently Northstar.

8.     Mark Nordlicht was a founding member of the Platinum entities and its Chief Investment Officer.   Starting in 2011, Nordlicht had primary responsibility for Platinum's

investment decisions and the valuation of its assets for all of the funds.  In 2013, Nordlicht bought a significant interest in the Beechwood companies.

9.      David Levy was senior executive at Platinum.  He was also the co-portfolio manager for Black Elk.  Levy also became a minority partner in the Beechwood companies.  In 2014, Levy became Platinum's Chief Investment Officer.  For a short time in 2014, Levy was the CFO of the Beechwood companies.

10.     Uri Landsman was the Managing Partner and President of PPVA.  Landsman was the primary investment contact and marketer of the Platinum funds, in particular, PPVA.

11.     Joseph SanFilippo was PPVA's Chief Financial Officer from 2005 to 2016.  He was a member of Platinum's valuation committee which determined PPVA's assets under management ("AUM"), management fees and incentive fees.

12.     Joseph Mann was in Platinum's marketing department from 2013 to 2016.  He was responsible for soliciting investments for the Platinum funds.

13.     Daniel Small was employed by Platinum from 2007 to July 2015 as a managing director and co-portfolio manager of Black Elk.

14.     Jeffrey Shulse was the CFO of Black Elk from January 2014 to September 2014 and CEO from September 2014 through April 2015.

15.     Murray Huberfeld was a partner in Platinum.  He participated in managing decisions and recruiter investors.  He also was a stakeholder in the Beechwood companies.  He founded the company along with Mark Nordlicht although his involvement in Platinum was concealed from the SEC.  Platinum likely concealed Huberfeld's management role from the SEC because FINRA had previously assessed Huberfeld with a fine of $426,790 in 1996 for

wrongdoing in connection with trading penny stocks.  Huberfeld started his own hedge fund, Centurion, which later became PPCO.

16.     Zach Weiner, was an associate in High Yield Direct Lending and Private Equity for Platinum Partners.  He started with Platinum Partners in 2009.  He was the person designated by Platrinum Partners to oversee the operations of Northstar and Golden Gate Oil from late 2014 to 2015.

17.     As of 2012, PPVA held primarily illiquid Level 3 assets[1] with a significant stake in oil and gas exploration and development companies.  Specifically, Platinum owned and controlled Black Elk Energy Offshore Operations, Inc. and Black Elk Energy Finance Corp., a Houston based oil and gas exploration and development company known generally as ("Black Elk").  In addition, Platinum owned and controlled Golden Gate Oil, LLC, an oil and gas exploration company based in Santa Maria, California.

18.     As stated above, as of 2012, Platinum's fund was heavily invested in illiquid companies, namely Black Elk and Golden Gate Oil, despite representations to its investors and prospective investors that it was a relatively liquid funds with guarantees of redemptions[2] with only 60 to 90 days' notice.  According to a December 31, 2012 report by Platinum's external auditor, BDO Tortuga, PPVA had $727 million assets under management.  PPVA's largest assets, accounting for 39% of its AUM and valued by Platinum at $283 million, was Black Elk.  However, in December 2012, Black Elk did not have the necessary cash flow and profits to justify an evaluation of $283 million.  Further, the previous month on November 16, 2012, Black Elk had

---

[1] Level 3 assets are assets whose fair value cannot be determined by using observable inputs or measures, such as market prices or models.  Level 3 assets are typically very illiquid, and fair values can only be calculated using estimates or risk-adjusted value ranges.
[2] Redemptions are a return on an investor's principal in a fixed-income security.

sustained a significant explosion on an offshore drilling rig which killed 3 persons, destroyed property, caused an oil spill, and interrupted oil production from the operations.

19.     Platinum had undisclosed financial problems before the Black Elk explosion.  Just ten days before the explosion, on November 6, 2012, Nordlicht sent an email titled, "Current Redemptions Nov 5, 2012" and stated, "If we don't exceed this in subs[3] from dec 1 and jan 1 we are probably going to have to put black elk in side pocket.[4]  i also need to pay back [loan from an individual] and an additional 4 million oct 31 and nov 30 so we are talking 40".  Landesman replied, "we could sweep the table here, so far, think jan 1st is a possible for some, if not all."  In response, Nordlicht wrote, "it's just very daunting.  It seems like we make some progress and then reds are relentless almost.  It's tough to get ahead in subs if u have to replace 150-200 a year".  Landesman replied back, "Didn't take it as complaining, it is my job,  Redemptions very daunting."

20.     In 2013, the financial health of Black Elk and Golden Gate did not get better.  Platinum decided to subject both companies to high interest rate loans, mostly from related parties, that further impaired the financial health of the companies but provided immediate cash to Platinum.  Platinum principals not only concealed the extent of the financial vulnerability of Black Elk and Golden Gate to investors and prospective investors but increased the valuation of each of the companies on PPVA's books.

21.     Black Elk and Golden Gate continued to fail due to lack of profitability and growing debt.  In March 2014, Nordlicht sent an email to Levy and SanFilippo, "Attached find both golden gate and black elk yr end comps.  As you will see, golden gate it's hard to come up with comps to

---

[3] "Subs" is short for subscriptions which is a process of placing investor's money into a hedge fund through a brokerage account, i.e., investors of the hedge fund.
[4] A side pocket is a type of account utilized in hedge funds to differentiate illiquid assets from more liquid investments.  Once an investment enters a side pocket account, only the present participants in the hedge fund are entitled to a share of it.  Future investors will not receive a share of the proceeds if the asset's returns get realized.

suppress valuation except maybe that we're in California or essentially very little current production. Black Elk more of a struggle the other way and cant use ebitda[5] because of troubles during the year". On April 29, 2014, Nordlicht emailed SanFilippo, "Start paying down reds as u can. Between Blake and ppbe (additional 10million), should have decent short term infusion. Hopefully some may 1 subs show up as well. Have a few more outflows to discuss but this is obviously the priority".

22.     In June 2014, Nordlicht wrote, "It can't go on like this or practically we will need to wind down…this is code red… We can't pay out 25 million in reds per quarter and have 5 come in". A June 3, 2014 email from a Platinum employee to Nordlicht entitled "Cash Sheet" listed cash on hand of $96,000, "Pending Inflows" totaling $20,000,000, "Pending Outflows" totaling $16.75 million, and "Redemptions $500,000 for May and $9.5 million for June, which resulted in "Projected Cash" of negative $6.14 million". Nordlicht forwarded this email to an employee requesting that employee to "Take reds off the list". The implication was that Platinum was unable to meet its June redemption obligations.

23.     Despite the "code red" issued by Nordlicht in June 2014 regarding Platinum's financial problems, Landesman told investors in response to an inquiry about Platinum's seemingly strong reported performance figures, "The number are all kosher, they have had verbal input every month."

24.     Platinum was desperate for new capital because it was unable to meet its customer's redemptions requests since its primary assets, Black Elk and Golden Gate, were failing miserably. Therefore, in December 2013, Platinum started courting Norman Seabrook, a portfolio manager

---

[5] Ebitda means Earnings before interest, tax, depreciation and amortization which is a measure of a company's operating performance. It is a way to evaluate a company's performance without having to factor in financing decisions, accounting decisions, or tax environments.

of the Annuity Fund Board of the New York City's Correction Officers' Benevolent Association ("COBA").  Seabrook agreed to use his position and influence with COBA to cause it to invest $10 million into Platinum in March 2014.  In June 2014, COBA invested another $5 million into the Platinum hedge fund.  In return, Platinum, through Huberfeld, paid $60,000 to Seabrook personally plus a $10,000 donation to a charity of Seabrook's choice.  Seabrook was honored by the charity.

25.     In 2013, Golden Gate suffered a $6 million loss due to cost overruns, borrowing at high interest from Platinum, and the failure of all but one well to produce.  Notwithstanding the poor financial condition of Golden Gate, Platinum reported its value as $170 million.  At the time, Golden Gate was 19% of PPVA's assets.   Platinum initially tried to have Black Elk purchase Golden Gate but Black Elk engineers had previously evaluated Golden Gate's oil reserves at 10% of Platinum's representation of the value of the oil reserves.  In addition, there had been a previously published valuation opinion that Golden Gate was worth only $60 million.  Notwithstanding Golden Gate's low value, in September 2014, Platinum paid $3.2 million for the remaining 52% ownership of Golden Gate but advised investors that value of the entire company was $140 million.  This made it appear to outsiders that PPVA made a $134 million profit, a 15% return, on its Golden Gate investment.

26.     Like Golden Gate, in late 2013 Black Elk was effectively insolvent.  However, unlike Golden Gate, Black Elk owned valuable assets in the form of offshore leases.  Platinum started looking for an exit strategy from Black Elk that would result in selling Black Elk's valuable assets and allowing Platinum alone to benefit from that sale.  In order for Platinum to benefit from the sale of Black Elk's assets, the bond holders had to agree that the preferred stock holder, Platinum, would be paid first from the sale of the assets and the bond holders second.  If the bond

holders were paid first then there would be very little money, if any, left from the sale of assets to pay Platinum, the preferred shareholder.

27.     Platinum set about buying up the bonds in disguise.  First, Platinum strategically leaked some unflattering financial information about Black Elk to lower the price of the bonds. Platinum purchased many of the bonds through a group on reinsurance companies it controlled referred to as Beechwood.  Levy assumed the position of Chief Investment Officer of Beechwood in order to cause Beechwood to purchase $37 million in Black Elk bonds.  This was done knowing that, if the plan succeeded, the bonds would be near worthless to Beechwood.

28.     After Platinum completed its bond buying spree under false pretenses, the amendment to the bond holders' indenture was presented to the bond holders.  On July 16, 2014, Small, after conferring with Nordlicht and Levy, sent an email to Black Elk's outside attorney stating that, "$18,321,000 bonds were controlled by PPVA and should be disclosed…".  The law required that Platinum disclose any ownership or control it had in or over a bond holder either directly or through an affiliated company.  In truth, Platinum controlled $98,631,000 of the bonds not just $18,321,000.  On August 13, 2014, the amendment to modify the senior status of the bond holder's right to payment over the preferred shareholder passed.  On August 18, 2014, Small instructed Shulse to wire $70 million from the sale of the assets to the preferred shareholder, Platinum.  Two days later Shulse wired another $25 million to Platinum.  A few weeks later Levy resigned from Beechwood and resumed his position at Platinum.

29.     During the negotiations of the sale of the Black Elk assets, on July 29, 2014, Shulse received an email from a Black Elk employee about vendors asking for an expected date of payment on outstanding bills.  Shulse forwarded the email to his personal Outlook email.  Then forwarded the Outlook email to Levy and Small stating, "This email is outrageous…I am using all

the restraint I have to not reply…They have a script…DON'T PROMISE VENDORS THEY WILL GET PAID 100% AT CLOSING…So instead of stating all of that in an email back to the group, I will say it to the three of you and you can coach me on what to do in response."[6]  This demonstrated Platinum's policy and practice of intentionally not paying the just amount due to creditors of companies it controls and instead diverting the funds to itself.  Despite selling the Black Elk assets to Renaissance Offshore for $170 million most of the vendors and contractors were never paid.

30.    As demonstrated in the email sent by Shulse to Levy and Small, Platinum's investment strategy was to extract the value out of companies for itself and leave the companies unable to pay its rightful creditors.  Platinum undertook this strategy with Franklin Power Company, Glacial Energy Holdings, Inc., Agera Energy, Inc., Golden Gate, Black Elk and the Beechwood companies.  There are direct links from money extracted from Franklin Power Company used to invest in Glacial Energy Holdings, Inc.  This ruined Franklin Power Company.  Then Platinum bought the assets out of the bankruptcy of Glacial Energy for Agera Energy, Inc. Platinum attempted to have Black Elk purchase Golden Gate.  The unsold assets from Black Elk were purchased by Northstar.  All of these companies failed after Platinum extracted the value leaving only crumbs for the creditors.

31.    In contrast to a policy of not paying the just amount owed to creditors of its companies, Shulse demonstrated great interest in receiving a bonus from the sale of the Black Elk assets.   On August 27, 2017, Shulse sent an email from his Outlook email account to Small requesting a bonus of $300,000 now and $300,000 later rather than the amount of $250,000 now and $250,000 in six months offered by Small.  On September 11, 2014, Shulse sent another email

---

[6] On July 11, 2014, Shulse had sent an email to Nordlicht, Small and Levy advising them of his new Outlook email address because he believed that his Black Elk email was being monitored.

to Small asking for an update on payment of the agreed upon bonus amount of $275,000.  In response, Small replied back to Shulse's Outlook email that he, Shulse, was authorized to pay himself a bonus of $275,000.

32.     John Hoffman, a former BP engineer and founder of Black Elk, had predicted that Platinum would enrich itself at Black Elk's expense.  On June 26, 2014, Hoffman emailed Black Elk's general counsel stating, "I apologize for this note out of the blue but I need your guidance. Platinum (PPVA) is planning to create many new companies and place the acquisitions (including Northstar) that Black Elk recently technically worked up, bid and won into those new entities. Many if not all of existing equity holders would be left in the cold with no equity in the new companies.  Further, they plan to isolate Black Elk, pay themselves back ([Series E] preferred equity) ahead of so-called friendly bond holders (the Beechwood entities) and lay off most people. I believe that the ultimate plan is to bankrupt the company."

33.     While Platinum was inflating the Golden Gate company value and illegally benefitting from the sale of Black Elk's assets, PPVA purchased Northstar.  Platinum had started negotiations to purchase Northstar in June 2014 and closed, after many delays due to funding problems, in September 2014.

34.     Platinum funded the purchase of Northstar primarily by the issuance of $80,000,000 of 12% Second Priority Senior Notes from Northstar GOM Holdings Group, LLC ("Northstar GOM").  New Mountain Finance Corp. purchased $30,000,000 of the Northstar GOM notes.  The balance of the notes was held by Platinum entities, PPVA and PPCO.  Northstar GOM owned all of Northstar's stock.  Northstar GOM was owned by PPVA O&G which, in turn, was owned by PPVA.  In addition to Platinum owning all of Northstar's stock, Platinum entities held much of Northstar's debt by virtue of loans made by PPCO and PPVA.

35.     Northstar needed cash to pay its outstanding working capital debt of $17 million. PPVA never made the promised capital available to Northstar.  By December 2014, Northstar required $2 million a month in working capital to pay contractors and vendors.  In January 2015, unpaid vendor and contractors started filing liens on the assets.  Northstar constantly requested money from PPVA but it fell on deaf ears.

36.     Despite Northstar's very stressed financial condition, Platinum caused Northstar to purchase the remaining assets that Black Elk had not sold to Renaissance Offshore.  It was Platinum's idea and decision not Northstar's management, consisting of Glynn Roberts, Ward Maloy, Mike Rauch and Jim Ulm, to purchase the Black Elk assets.  Further, Platinum paid significantly more than what Northstar management believed to be the market value for the Black Elk assets.  Further, against Northstar's management advice, Platinum made Northstar pay the bills arising out of Black Elk's assets, which included many liens, for months before the assignment of the assets was officially transferred.  At the time of closing Platinum omitted on the closing term sheet approximately $4 million in credit owed to Northstar for paying those debts in order to increase the alleged value received by Black Elk from the assignment.

37.     Northstar purchased the Black Elk offshore leases in April 2015.  The assignment and amended assignments were stated to be effective as of December 31, 2014 in order to improve Black Elk's financial condition for 2014 valuation purposes.  Platinum, not the management of Northstar, decided on the effective date recorded on the assignments.

38.     In this same time frame, December 2014 to March 2015, PPVA received many requests for redemptions which would be due on April 30, 2015.  At this point, the principals went on a campaign to find new investors and talk current investors out of executing on their redemption requests.  By November 2015, the investors were complaining about PPVA's failure to pay on the

redemptions.   On November 23, 2015, Mann sent a message to PPVA investors from Nordlicht that Platinum was going to "segregate certain illiquid assets (and related liabilities) from the remainder of the assets in the portfolio (the "Special Investments") in the interest of protecting investors and maximizing returns".   These illiquid investments were primarily composed of Northstar.

39.     In early 2015, Platinum's external auditor, BDO Tortuga, reported to Platinum that "a material weakness exists in the Master Fund's investment valuation process related to its Level 3 investments".   The auditor also identified a "very material" misstatement that required a large markdown of the valuation of one large, illiquid position, triggering a restatement of the fund's year-end 2013 AUM.  Platinum did not disclose this information to its investors.  Rather, Platinum fired its external auditor.  Its replacement auditor, CohnReznick LLP, stated in an opinion on 2014 financial affairs, released in 2015, that management's estimated values on over $800 million in assets rested on unobservable inputs, and the amounts that might be realized in the near-term could differ materially from management's valuations.

40.     Platinum had been suffering repeated liquidity crises since 2012.   However, Platinum would not attempt to cash out on its illiquid assets, namely the oil and gas companies, likely because Platinum would have to take a substantial loss.   Thus, Platinum would solve its redemption problems by paying out of its liquid funds.  This further increased the percentage of illiquid capital compared to the liquid capital in the collection of funds.  However, the upside of the fund owning illiquid capital in the form of non-public oil and gas exploration companies is that Platinum controlled the valuation of the companies thereby leading investors to believe they were valuable assets when, in fact, they were not.

41.     In December 2015, New Mountain Finance Corp. issued a default notice claiming that PPVA gave notice the prior month that Northstar GOM would not be able to re-purchase $7.5 million in notes as it had agreed to do at the time it purchased Northstar in 2014.  New Mountain Finance Corp. stated that the event of default triggered PPVA's obligation to re-purchase the total amount of $30 million of the notes held by New Mountain Finance Corp.  In March 2016, New Mountain Finance Corp. sued PPVA in New York state court for the default on the Northstar GOM notes.  Platinum issued a press release denying that an event of default had occurred.

42.     In addition to forcing Northstar to purchase the Black Elk assets at an over-valued price, Platinum controlled Northstar in other materials respects as well.  Platinum refused to fill vacancies left on the board when prior managers left the company.  After Platinum acquired Northstar in September 2014, the board consisted of Roberts (former Northstar management), Freeman (former Northstar management) and Daniel Small (Platinum executive).   Roberts and Freeman left Northstar in October 2015.  A few months later other managers left including Ulm, Rauch and Ken Schott.  Platinum refused to appoint board members despite requests by Brian MacMillan of Northstar to appoint board members.  Platinum did not appoint a board until after the involuntary bankruptcy petition was filed in August 2016.

43.     Platinum never implemented corporate governance of Northstar.  As stated above, there were no board members appointed to fill vacancies.  There were no board meetings, minutes, or by-laws.  There appeared to be a limited liability company operating agreement but many of the provisions were inapplicable because apparently it was a cut and paste document from another company's operating agreement.  The was no Texas Franchise Tax Public Information Report filed for 2016.

44.     Platinum tightly controlled the finances of Northstar.  Weiner and sometimes Levy of Platinum acted as the de facto CFO for Morthstar.  Northstar management had to seek money and approval to pay bills from Weiner and Levy.  Northstar management had to send lists of bills it would like to pay and hope that Platinum provided the money and approval to pay the bills. Weiner and Levy decided which creditors were paid.  The office catch-phrase to illustrate how Platinum tightly controlled the money to pay the bills was, "Hopefully tomorrow, definitely Monday".  Further, Maloy and MacMillan had to seek approval from Levy in order to promote Alcorn to Vice-President of Finance in May 2016.

45.     On December 28, 2015, Platinum caused Northstar to enter into short-term high interest loans with Northstar GOM and PPCO to provide up to a total of $50 million in funding. However, Northstar GOM and PPCO only provided a small amount of the promised funds to Northstar.  This had the benefit of creating the appearance of high interest receivables on the books for Northstar GOM and PPCO for valuation purposes.   In the meantime, emails between Nordlicht and Huberfeld in December 2015 revealed they were considering a permanent move to Israel because of the financial problems with Platinum.

46.     It was not long before Platinum made another move to get its hands on cash with no reasonable expectation or plan to repay the cash along with the debts owed to other just and lawful creditors.  Platinum caused Northstar to enter into a terrible commodity swap agreement with BP.  At this point Northstar had run out of options to obtain the needed cash.  Traditional bank loans were not an option.

47.     Platinum originated the idea of receiving a loan from BP also referred to as a prepay.  A series of emails between Weiner and a group of BP employees documented the discussion between Platinum and BP arranging for Northstar to enter into the first prepay

transaction with BP. Northstar management, at that time Maloy, Alcorn and MacMillan, were not included in the conversations. On January 19, 2016, Weiner emailed Frank Verducci of BP with other BP employees copied on the email, asking if Platinum could provide security for the prepay loan by placing a lien on assets. Verducci responded to Weiner that Russell Diamond of the BP credit department will send information on how Platinum may guarantee the prepay liabilities for the transaction. Twenty minutes later Diamond emailed Weiner for information about the Platinum guarantee. Weiner replied to Diamond and Verducci stating, "We would like for northstar to sell forward 500 barrels per day for the next six months, today. We will guarantee payment of the actual sales value of the 500/d at the end of each month. If we assume the price of oil to be $30, the amount of the guaranty would be 2.7M over six months." In response, Verducci stated that BP may require Northstar to enter into a physical oil & gas marketing contract with BP to coincide with the "tenor" of the prepayment. In other words, the prepayment was actually a very high interest loan so in order to disguise the nature of the financial transaction BP desired to have a separate agreement to actually market the oil in order to make the prepay transaction appear to be a commodity swap agreement.

48.     That afternoon, Weiner, instructed Maloy, Alcorn and MacMillan to provide information to Verducci about current physical marketing agreements. Diamond later emailed Weiner asking whether Northstar will be making monthly payments or one payment at the end of the term to re-pay the prepayment transaction. Diamond attached a form to complete for the BP credit department. Weiner forwarded the form to Maloy and Alcorn requesting that they complete the form.

49.     On February 16, 2016, Weiner instructed Maloy to execute the transaction documents for Northstar.

50. <u>Transaction 1</u>:  The contract provided that BP would pre-pay Northstar for 99,000 barrels of oil at a fixed price of $35.54/bbl which was the current and lowest price per barrel since December 2001.  BP then applied a large discount rate which decreased the fixed price per barrel to $32.60/bbl.  Northstar received $3,227,171.61 on February 22, 2016 from BP.

51. The contract required that Northstar repay the money to BP on a monthly basis starting in May.  Northstar would make monthly settlement payments for the next nine months from May to January.  The irregular terms of the contract guaranteed that Northstar would be making payments to BP every month.

52. The amount of the repayment was set by the price of a barrel of oil according to NYMEX WTI on the 20th day of the month preceding the settlement month.  As predicted by the industry in February, the price per barrel increased.  For the month of April, it increased by 15% to $41/bbl.  The next month the price per barrel increased 26% from the historical low in February to $47/bbl.  The following month it increased again to $49/bbl, a nearly 30% increase in the price per barrel from February to June.  Thus, the Northstar had to repay the heavily discounted money at an enormous mark-up based on the expected increased price of oil.  Northstar management viewed the prepayment transaction as highly unusual and not consistent with a commodity swap agreement.  The discount rate for the cash was outside of industry standards making it a very expensive loan.  In addition, it was unusual for a parent company to personally guarantee the repayment of a swap agreement.

53. The details are as follows:

| Payment Date of Loan | 1/9 of Money Received from BP with Discount Rate Applied | Amount of Repayment 11,000 barrels x Price of Oil | Difference Between Amount Received and Amount Repaid | No. of Days since Receipt of Funds on Feb 22 |
|---|---|---|---|---|
| | | | | |

| May 21 | $359,469.33 | $452,375.00 | $92,905.67 | 90 |
| June 21 | $359,273.86 | $514,767.00 | $155,493.14 | 120 |
| July 28 | $359,078.39 | $537,383.00 | $178,304.61 | 150 |

54.     On February 17, 2016, Weiner sent an email to Alcorn, Maloy and MacMillan stating, "Guys I want to have straight exactly what we are spending the BP money on.  Can we spend a few minutes on the phone so we are all on the same page?".  Later that morning at 10:27 am, Weiner emailed Alcorn, MacMillan and Maloy advising them of four matters that Weiner wants paid.  Maloy responded back, "Yes.  We will review and discuss.".   One of those matters was paying a man named Randy Crawford.  On February 29, 2016, Weiner emailed Maloy, MacMillan and Alcorn, and copied Levy, telling them to "pay Randy 200."

55.     In May 2016, Northstar management advised Platinum, through Weiner, that Northstar could not afford to repay BP the first repayment due on May 21, 2016 in light of all of the other bills it owed for operations.  Weiner instructed Alcorn to make the first payment due to BP on May 21, 2016 in the amount of $452,375.00.  In this same time, Northstar did not have the means to pay a $3000 bill to a contractor which shut down operations at an income-producing well.  Weiner offered to pay the $3000 bill personally in order to resume operations on the well since Northstar did not have the funds to pay it.

56.     Shortly thereafter, Northstar learned for the first time that Weiner had entered into another prepay transaction with BP.  Like the first prepay transaction, the second BP transaction was originated by Weiner without input or consent by Northstar management.  On May 27, 2016, Weiner emailed Alcorn, Maloy, Levy and copied MacMillan, advising them that BP will be providing $ 1.55 million through a second prepayment transaction.  Based on information later

18

acquired, Alcorn believes that Weiner instructed him to make the May 21 repayment to BP in order to not disrupt finalizing the second prepayment transaction.  Alcorn was instructed by Weiner to sign the transaction documents for the second prepay transaction on June 3, 2016.

57.     Transaction 2: On June 6, 2016, BP paid Northstar $1,574,876.00 based on the price of $49/bbl for 35,000 barrels.  Then BP applied a discount rate which decreased the amount paid to $45/bbl.  Again, the discount rate was very high and not within industry standards.  The contract required Northstar to repay the money in July.  Northstar was obligated to make the monthly settlement payments for the next seven months from July to January.  The irregular terms of the transaction guaranteed that Northstar would owe money to BP every month.  The amount of the monthly repayment was calculated by the price of oil per barrel on the 20th day of the preceding month times 5,0000 barrels.

58.     The details are as follows:

| Payment Date of Loan | 1/7 of Money Received from BP with Discount Rate Applied | Amount of Payment 5,000 barrels x Price of Oil | Difference between Amount Received and Amount Repaid | No. of Day since Receipt of Funds on June 6 |
|---|---|---|---|---|
| July 28 | $225,153.85 | $244,265.00 | $19,111.15 | 52 |

59.     On June 21, 2016, the second repayment was owed to BP in the amount of $514,767.00.  Alcorn advised Weiner that although the $1.55 million recently received from BP aided in cash flow that Northstar was still in debt to many contractors and vendors.  Weiner advised Alcorn that he must make the BP repayment due on June 21.

60.     In July 2016, Alcorn informed Weiner that he would not make the payment of $781,648.00 owed to BP on July 21, 2016 because Northstar instead needed to pay money owed for general overhead and to contractors who provided services for operation of income-producing

wells.  Alcorn believed he was likely jeopardizing his employment with Northstar by refusing to make the payment as instructed but he stood his ground.  Alcorn argued that Northstar was broke thus Platinum as the originator of the transactions and personal guarantors of the repayments should be the company making the payments not Northstar.  Alcorn finally made the payment on July 28, 2016 after Platinum wired the money from Northstar GOM.  Alcorn believed that Platinum was fearful that BP would sue on the personal guarantees thus causing a public embarrassment and, as he later learned, undermining the fragile Ponzi scheme.

61.    The terms of the transactions did not represent the terms of a typical commodity swap agreement because BP was paying a fixed-price of the lowest price per barrel in over 15 years, the discount rate was extremely high, and Northstar was locked into the terrible deal through January of the next year.  Under the circumstances, it was certain that Northstar would lose money, and probably a lot of money, because Northstar was receiving a historically low price for oil plus receiving a discounted rate on the upfront cash.  The irregular terms of the so-called commodity swap agreement undermined the purpose of a commodity swap agreement which is to provide price protection to parties.  Further, the commodity was never actually swapped under the agreement.  Northstar subjectively knew at the time it agreed to the transactions that it would not be able to afford to repay both BP and its other creditors when the time came to repay the money but nevertheless entered into the transactions for the immediate cash.  In other words, Northstar knowingly and intentionally entered into the transactions with the intent to delay, hinder and defraud its creditors in the future.  Likewise, Northstar, controlled by Platinum, voluntarily made the Transfers (repayments) to BP with the intention to hinder, delay and defraud its creditors.

62.    In addition, BP had actual knowledge that Northstar would not be able to repay both BP and Northstar's other creditors at the time BP agreed to these transactions.  BP had prior

actual knowledge that Platinum Partners was an uncreditworthy company. BP had actual knowledge that Northstar was in dire straits. BP acquired this information in 2014 when Northstar was forced to sell a valuable 3-year hedge agreement with BP in order to obtain immediate cash for the business. Thus, BP knew that it could take advantage of Northstar by offering a deal for desperately needed cash at loan-shark interest rates.

63.    Further, BP knew that Northstar, not the personal guarantor, Platinum Partners, would be forced to repay the money to BP at the expense of paying its vendors and contractors. This is because BP agreed to accept a personal guaranty from a Cayman Islands based affiliate of Platinum Partners. The Cayman Islands is a jurisdiction in which it is known to be difficult to collect judgments. Further, BP knew that Platinum Partners had financial problems itself. Thus, the personal guaranty was illusory.

64.    The irregular terms of the commodity swap agreements rendered them constructive loans rather than commodity swaps. Both, BP and Northstar (controlled by Platinum) knew that the transactions were not serving as commodity swap agreements that would be typical in the oil industry. This is noted by Verducci in an email to Weiner wherein he stated that BP wanted another agreement to market Northstar's physical oil given the "tenor" of the prepay arrangement. Both BP and Northstar (controlled by Platinum) knew it was a means for Northstar to receive immediate cash. Both BP and Northstar (controlled by Platinum) knew the repayment of the cash would negatively impact Northstar's ability to repay its other creditors. Yet, BP and Northstar (controlled by Platinum) proceeded with the transactions because Northstar was desperate for cash and BP would realize a colossal return on its money. As noted above, the commodity never exchanged hands. BP should not escape accountability for receipt of the Transfers because it

labeled the transactions commodity swaps when in fact it was a way to make a high rate of interest on its money.

65.     Although Platinum is not a defendant in this suit, its acts of controlling Northstar are relevant to the recovery of the Transfers.  Thus, Plaintiff hereby pleads that Platinum's actions pierced the corporate veil between it, Northstar GOM, and the subsidiary company, Northstar Offshore Group, LLC.  Specifically, Platinum pierced the corporate veil by, among other things: (1) micro-management of Northstar's accounts payable; (2) requiring approval for promotion of a Northstar employee; (3) refusing and disregarding corporate formalities of board meetings, minutes, by-laws, a meaningful company operating agreement, and a corporate filing; (4) refusal to appoint a full board to transact business; (5) forcing Northstar against Northstar management's recommendation to purchase the Black Elk assets; (6) omitting a $4 million credit owed to Northstar at the closing of the Black Elk Assets and setting the effective date of the assignments for the benefit of Black Elk; (7) forcing Northstar to enter into loan agreements with the parent companies to create financial wealth on paper for the parent companies;  (8)  forcing Northstar to enter into two prepay transactions with BP; and (9) forcing Northstar to repay BP to the detriment and expense of Northstar's other creditors.   In addition, Platinum acted as the agent of Northstar in forcing Northstar to enter into the prepay transactions and making the repayments to BP when Northstar was insolvent.

66.     Platinum was in such bad financial shape in the time frame it executed the high-interest loans with BP that it was unable to pay redemptions to its investors or make interest payments on its debt.  New Mountain Finance Group had declared a default on the repayment of the notes issued by Northstar GOM and had a pending lawsuit in state court in New York. Platinum had every intention of using the cash from BP deals to benefit itself at the expense of

Northstar's just and lawful creditors.  Platinum had already demonstrated this policy and practice of taking funds from a company for itself with no intention or plan to pay creditors in its Black Elk dealings along with many other like Franklin Power Company, Glacial Energy Holdings, Agera Energy and the Beechwood companies.  While the honest creditors of the companies received little to nothing, Platinum's management to receive over $100 million in management fees alone from 2011 to 2016.

67.    On April 14, 2016, an unidentified Platinum principal (likely Huberfeld) received an email from a Platinum investor that stated, "May I remind you that I asked you several times to transfer 5 million dollars to my account at [a bank].  Why you don't follow my instructions.  What kind of behavior is this?  I have no words to express how annoying is this situation for me."  The unidentified Platinum principal forwarded the unhappy investors' email to Levy at his private Gmail address and to Nordlicht.

68.    In May 2016, just a few months after making the deal with BP, Platinum was so desperate for capital that it asked personal friends and the National Society for Hebrew Day Schools for loans.  It was reported that Platinum had only $68,350 in cash in May 2016.  On May 27, 2016, Platinum received a $6.3 million loan from Richard Stadtmauer, $4.1 million loan from Marisa Stadtmauer, and a $2.2 million loan from the National Society for Hebrew Day Schools. Unlike the high interest rates Platinum charged to the companies in its fund, these loans carried a 7% interest rate.

69.    On June 8, 2016, Huberfeld and Seabrook were arrested for committing honest services fraud for the payment made by Huberfeld to Seabrook in exchange for the COBA investment in Platinum.

70.     In late June 2016, the FBI raided Platinum's office in connection with charges that the hedge fund was a Ponzi scheme.

71.     On August 12, 2016 (the "<u>Involuntary Petition Date</u>"), a group of creditors filed an Involuntary Petition against Northstar.  On December 2, 2016 (the "<u>Voluntary Petition Date</u>"), Northstar converted the involuntary bankruptcy case to a voluntary case.  On December 22, 2017, the Court confirmed the Plan and on January 19, 2018, the Plan became effective.

72.     On August 23, 2016, PPVA filed a Winding Up Petition in the Grand Court of the Cayman Islands.  PPVA sought relief from creditors in order to reorganize financially and eventually continue in business.  The Grand Court of the Cayman Islands ordered liquidation of PPVA.  On October 18, 2017, the court-appointed joint liquidators filed petition for recognition of the foreign liquidation proceeding under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York.

73.     On November 21, 2018, the Grand Cayman court-appointed liquidators filed suit in the United States District Court of New York against Platinum executives, affiliated companies, and Platinum executives' family members for violation of the civil RICO statute.  On December 14, 2016, the Platinum executives were indicted for securities fraud, investment advisor fraud, conspiracy and wire fraud in the United States District Court of the Eastern District of New York.  On December 15, 2016, the SEC sued the Platinum executives for operating a Ponzi scheme in the United States District Court of the Eastern District of New York.  Numerous other suits have followed.

74.     The press has compared the size of the Platinum Partners hedge fund Ponzi scheme to that of the Madoff Ponzi scheme.

75.     As of the Involuntary Petition Date, Northstar was engaged in the business of exploration and production of oil and gas, primarily in the Gulf of Mexico.  Northstar's principal office is located in Houston, Texas.

76.     Consistent with his obligations, the Trustee has conducted a review of all transfers made by Northstar to creditors within two years prior to the Involuntary Petition Date.  The Trustee has determined that transfers made by Northstar to BP should be avoided because Northstar voluntarily made such transfers with actual intent to hinder, delay and defraud its creditors. Further, Trustee has determined that the transactions made the basis of the transfers are not commodity contracts but actually loans labeled as commodity swap agreements.  Specifically, the Trustee seeks to avoid the following transfers made to BP: a payment of $452,375.00 made by wire on May 21, 2016, a payment of $514,767.00 made by wire on June 21, 2016, and a payment of $781,648.00 made by wire on July 28, 2016 (collectively known as "Transfers").  The total amount is $1,748,790.00.

77.     On June 15, 2018, the Trustee sent a demand letter to the Defendant requesting: (i) the return of the Transfer as preferential pursuant to §§ 548, and 550(a) of the Bankruptcy Code; or (ii) that the Defendant provide the Trustee with valid defenses to payment, including an explanation of such defenses and copies of supporting documentation.  To date, the Defendant has neither: (i) returned the Transfer to the Trustee; nor (ii) provided the Trustee with sufficient documentation to support a complete defense to liability.  Therefore, Trustee seeks to avoid the Transfers pursuant to §§ 547(b), 548(a)(1)(A), and 548(a)(1)(B).

**VI.**
**Avoidance of Preferential Transfers – 11 U.S.C. § 547**

**A. The transactions underlying the Transfers were not commodity or swap agreements.**

78.     Trustee maintains that the transactions made the basis of the Transfers were not commodity contracts as defined by § 761(4).  As set forth above, the transactions were short-term, high interest loans labeled commodity swap agreements to disguise the usurious amount of interest to be collected by BP.  Therefore, Trustee is not prohibited under §§ 546(e) or (g) in seeking to avoid the Transfers pursuant to §547(b).

**B. The Transfers were made on or within ninety (90) days before the Involuntary Petition Date.**

79.     The Transfers were made on or within ninety (90) days prior to the Involuntary Petition Date, that is, between May 14, 2016 and August 12, 2016 (the "Preference Period").

**The Transfers were a transfer of an interest of the Debtor's Property.**

80.     The wire payments were made from the Debtor's bank account.  Had the wire payments not occurred, the property subject to the wire payments would have been part of the Debtor's bankruptcy estate on the Involuntary Petition Date.  Therefore, the wire payments constitute the transfer of an interest in property of the Debtor.

**C. The Transfers were made to or for the benefit of a creditor.**

81.     The Defendant was a creditor of the Debtor because, *inter alia,* the Defendant had invoiced the Debtor to repay money which it had loaned to the Debtor, without taking a security interest in Debtor's property, and that the Debtor was obligated to pay.  The Transfers were made, or caused to be made, to or for the benefit of the Defendant creditor.

**D. The Transfers were made for or on account of an antecedent debt owed by Debtor to Defendant.**

82.     The Transfers were made, or caused to be made, for or on account of an antecedent debt owed by the Debtor to the Defendant.  The Transfers were in satisfaction of, or on account

of, funds previously provided by the Defendant to the Debtor and for which the Debtor owed the Defendant at the time the Transfers were made.  Thus, the Transfers were made or caused to be made, for or on account of an antecedent debt owed by the Debtor to the Defendant.

**E.  Debtor was insolvent at the time the Transfers were made.**

83.    The Debtor is presumed to have been insolvent during the Preference Period.  *See* 11 U.S.C. § 547(f).  Moreover, during the Preference Period, the Debtor was in fact insolvent within the meaning of § 101(32) of the Bankruptcy Code as its debts exceeded the fair value of its assets.

**F.  The Transfers enabled Defendant to receive more than it would have received as an unsecured creditor.**

84.    If the Transfers had not been made, the Defendant would have an unsecured claim in the amount of the Transfers against the Debtor.

85.    Pursuant to § 547(b) of the Bankruptcy Code, the Trustee may avoid the Transfers.

**VII.**
**Avoidance of Fraudulent Transfers – 11 U.S.C. § 548(a)(1)(A)**

**A.      The wire payments were a transfer of an interest of the Debtor's property.**

86.    The wire payments were made from the Debtor's bank account.  Had the wire payments not occurred, the property subject to the Transfers would have been part of the Debtor's bankruptcy estate on the Involuntary Petition Date.  Therefore, the wire payments constituted the transfer of an interest in property of the Debtor.

**B.      The Transfers were made on or before two years before date of the filing of the petition.**

87.    The Involuntary Petition was filed on August 12, 2016.  The Transfers were made on May 21, 2016, June 21, 2016, and July 21, 2016.  Therefore, the Transfers were made within two years of the filing of the Involuntary Petition.

**C.     The Debtor voluntarily incurred the obligations and made such Transfers with actual intent to hinder, delay and defraud entities to which the Debtor was or became indebted.**

88.     The Debtor incurred the obligations and made the Transfers to protect itself and the controlling shareholder, Platinum Partners.   Debtor incurred the obligations and made the Transfers with the actual intent of hindering, delaying and defrauding its vendors and contractors because Debtor was insolvent at the time it incurred the obligations and made the Transfers. Debtor intended to defraud its creditors because Debtor had actual knowledge it could not pay for the labor, materials or services at the time it incurred the debt with its vendors and contractors. Debtor knew at the time it made the Transfers to BP that it would not be able to repay both the money owed to BP and its other creditors but nevertheless proceeded to make the Transfers.   The transactions with BP and the subsequent Transfers to BP were made in furtherance of the Ponzi scheme to give the illusion that Northstar was a successful oil and gas company thus making the hedge appear successful as well.

89.     Pursuant to § 548(a)(1)(A) of the Bankruptcy Code, the Trustee may avoid the Transfers.

**VIII.**
**Avoidance of Transfers – 11 U.S.C. § 548(a)(1)(B)**

**A.     The transactions underlying the Transfers were not commodity or swap agreements.**

90.     Trustee maintains that the transactions made the basis of the Transfers were not commodity contracts as defined by § 761(4).   As set forth above, the transactions were short-term, high interest loans labeled commodity swap agreements to disguise the usurious amount of interest to be collected by BP.   Therefore, Trustee is not prohibited under §§ 546(e) or (g) in seeking to avoid the Transfers pursuant to §548(a)(1)(B).

**B.      The wire payments were a transfer of an interest of the Debtor's Property.**

91.     The wire payments were made from the Debtor's bank account.  Had the wire payments not occurred, the property subject to the Transfers would have been part of the Debtor's bankruptcy estate on the Involuntary Petition Date.  Therefore, the wire payments constituted the transfer of an interest in property of the Debtor.

**C.      The Transfers were made on or before two years before date of the filing of the petition.**

92.     The Involuntary Petition was filed on August 12, 2016.  The Transfers were made on May 21, 2016, June 21, 2016 and July 21, 2016.  Therefore, the Transfers were made within two years of the filing of the Involuntary Petition.

**D.      The Transfers were less than a reasonably equivalent value.**

93.     As set forth above, the Debtor received less than a reasonably equivalent value in exchange for the Transfers.  The transactions with BP and the subsequent Transfers to BP were made in furtherance of the Ponzi scheme to give the illusion that Northstar was a successful oil and gas company thus making the hedge appear successful as well.

**E.      The Debtor was insolvent when Transfers made.**

94.     The Debtor was insolvent on the date that such Transfers were made and when such obligations were incurred.

**IX.
Recovery of Avoided Transfers – 11 U.S.C. § 550(a)**

95.     Section 550(a) of the Bankruptcy Code allows the Trustee to recover, for the benefit of the estate, the property transferred and avoided under §§ 547(b) and 548 from the initial transferee of such transfer or the entity for whose benefit such transfer was made.  *See* 11 U.S.C. § 550(a).  The Defendant was the initial transferee of the Transfers and was the person or entity

for whose benefit the Transfers were made.  Accordingly, the Trustee is entitled to recover the Transfers in the amount of $1,425,829.00 plus costs and interest thereon until the date of payment.

## X.
## Disallowance of Claim Against the Estate – 11 U.S.C. § 502(d)

96.     To prevent creditors from wrongfully refusing to return Transfers avoidable under §§ 547(b) and 548 and thereby depleting the funds available to pay non-preferred creditors, Section 502(d) of the Bankruptcy Code provides that the Court shall disallow any claim of any entity that fails to turn over an avoidable transfer.  Accordingly, the Trustee has suspended or will suspend distributions to the Defendant until the Defendant returns the Transfers.

97.     Further, 11 U.S.C. § 502(j) expressly provides that a claim which has been allowed may be reconsidered for "cause," including disallowance under § 502(d), up to the amount for which the Defendant is liable to the Trust under §§ 547(b) and 548 and 550(a).  Accordingly, the Trustee requests that (i) the Court disallow any claim of the Defendant, whether previously deemed allowed or not, up to the amount that the distribution on such claim equals the amount for which the Defendant is liable to the Trust under §§ 547(b) and 548 and 550(a); (ii) the Trustee retain such amount in satisfaction of Trustee's claims against the Defendant with a corresponding reduction in the amount of the judgment to be rendered against the Defendant; and (iii) the Court render judgment in favor of the Trustee and against the Defendant for all amounts for which the Defendant is liable under §§ 547(b), 548 and 550(a) that are not otherwise satisfied by disallowing the Defendant's allowed claim.

## XI.
## Prayer

For the foregoing reasons, the Trustee requests entry of judgment against the Defendant as follows:

i.      Declaring the Transfers to be avoidable under § 547(b) of the Bankruptcy Code;

ii.     Declaring the Transfers to be avoidable under § 548(a)(1)(A) of the Bankruptcy Code;

iii.    Declaring the Transfers to be avoidable under § 548(a)(1)(B) of the Bankruptcy Code;

iv.     Avoiding and setting aside the Transfers under §550 of the Bankruptcy Code;

v.      Awarding the Trustee judgment against the Defendant in the amount of the Transfers and directing the Defendant to immediately repay to the Trustee such amount, pursuant to § 550(a) of the Bankruptcy Code;

vi.     Awarding the Trustee pre-judgment interest from the date of the Transfers at the maximum rate permitted by law;

v.      Awarding the Trustee post-judgment interest from the date of judgment until the date paid at the maximum rate permitted by law;

vi.     Awarding the Trustee its costs incurred in this action; and

vii.    Granting the Trustee such other and further relief as the Court deems just and proper.

Respectfully submitted,

By: /s/ Kelly Greenwood Prather
Kelly Greenwood Prather
TBN: 00796670;
So. Dist. of Texas No: 21829
The Greenwood Prather Law Firm, PLLC
2009 North Durham Drive
Houston, Texas 77008
Telephone: (713) 333-3200
Facsimile: (713) 621-1449
E-Mail: kgreenwood@midtownlegal.com

**Special Counsel for James Katchadurian, Litigation Trustee for the Litigation Trust of Northstar Offshore Group LLC**

Dated: May 22, 2019.

**Certificate of Service**

31

I certify that First Amended Complaint to Avoid and Recover Preferential and Fraudulent Transfers was served in accordance with Bankruptcy Rules of Procedure and Federal Rules of Procedure on the attorney of record for BP Energy Company, John J. Sparacino, at jjsparacino@voyrs.com on this the 22nd day of May, 2019.


/s/ Kelly G. Prather
Kelly Greenwood Prather
